**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KEITH HODDENBACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23 C 50174** |
| | ) | |
| **PETER POPOVICH, and LARRY O. SY,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith Hoddenbach is currently incarcerated at Dixon Correctional Center ("Dixon"), an Illinois Department of Corrections ("IDOC") facility located in Dixon, Illinois. In 2021, Hoddenbach saw the prison's optometrist, Dr. Peter Popovich, for an eye exam. Hoddenbach, who suffered an eye injury as a child, claims that Dr. Popovich promised to refer him to a specialist, but never did. He later suffered a retinal detachment, resulting in complete loss of vision in his right eye. In this lawsuit, brought under 42 U.S.C. § 1983, he alleges that Dr. Popovich and Dr. Larry Sy, the prison's medical director, were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Drs. Popovich and Sy have moved for summary judgment; Plaintiff, through recruited counsel, has responded. As explained below, this motion is granted.

## BACKGROUND

The facts laid out below are taken from the parties' respective Local Rule 56.1 filings. As it must, the court takes the facts in the light most favorable to Hoddenbach and draws all reasonable inferences in his favor. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 831 (7th Cir. 2026).

Mr. Hoddenbach is a prisoner at Dixon. In around 1973, at ten years old, Hoddenbach suffered a head injury that caused a retinal detachment in his right eye. (DSOF [65] ¶¶ 15–16;

PSOF [70] ¶ 1.) A retinal detachment is a surgical emergency that "occurs when the retina is out of place"; left untreated, it can cause vision loss. (DSOF [65] ¶ 14; PSOF [70] ¶ 18.) Causes vary, and can include trauma, age, or genetic predisposition. (DSOF [65] ¶ 14.) Hoddenbach had eye surgery in the 1970s to address the retinal detachment. (PSOF [70] ¶ 1.)

In 2010 or 2011, Mr. Hoddenbach, by then incarcerated, had additional surgery on his right retina at the University of Illinois Chicago ("UIC") hospital. (*Id.* ¶ 2; DSOF [65] ¶ 16.) He testified in his deposition that before the surgery, he had been prescribed antibiotics for an infection, and, about a day after he started taking them, he noticed blurriness in his right eye. (Pl. Dep. [65-1] at 14:18–15:22.) An eye doctor found a tear in his retina. (*Id.*) When this tear progressed to a complete detachment, he had additional surgery (Plaintiff does not explain the results). (*Id.*)

A decade later, on September 22, 2021, Mr. Hoddenbach saw Dr. Popovich at the Dixon optometry clinic for an eye exam. The events of this meeting are disputed. According to Dr. Popovich's declaration and the prison's medical records, Dr. Popovich observed "traumatic iris damage" and "traumatic cataract"[1] in Plaintiff's right eye, as reflected in a "slit lamp exam," a routine eye examination that allows the doctor to see every part of the eye and diagnose conditions like cataracts.[2] (DSOF [65] ¶¶ 17–18; Ex. B, Medical Records [65-2] at 11.) When or how Hoddenbach suffered "traumatic iris damage" or "traumatic cataract" injuries is not clear. Dr.

[1] The court notes that what appears to distinguish a "traumatic" cataract or "traumatic" iris damage from a regular cataract or iris damage is that both result from an injury, like blunt trauma or perforation, to the eye, whereas a non-traumatic cataract or iris damage could result from age, genetic conditions, infections, etc. *See What to Know About Traumatic Cataracts*, Med. News Today, https://www.medicalnewstoday.com/articles/traumatic-cataract (last visited Sep. 4, 2026); *Traumatic Iris Damage*, Clinical Reference: Optometry Hub, https://optometry-hub.com/eye-diseases/iris/traumatic-iris-damage (last visited Sept. 23, 2026). Surgery is the most common treatment method for a traumatic cataract, though this can vary depending on the severity of the condition. *See id.*

[2] *Slit Lamp Exam*, Cleveland Clinic (Nov. 1, 2022), https://my.clevelandclinic.org/health/diagnostics/24422-slit-lamp-exam (last visited Sept. 23, 2026). A slit lamp exam allows a doctor to evaluate the lids, lashes, conjunctiva, cornea, anterior chamber, iris, and lens of the eye. (*See* Ex. B, Medical Records [65-2] at 11.)

Popovich also noted that Plaintiff's vision had not changed since the "last exam"; the date of that "last exam" is not in the record, but Dr. Popovich's note suggests that the eye injuries he observed may not have been new. (Ex. B, Medical Records [65-2] at 11.) Dr. Popovich ultimately determined that Plaintiff likely had an "old traumatic cataract" in his right eye (whether this may have been related to the childhood injury or to the 2010 surgery is also not clear). (DSOF [65] ¶ 17.) Defendants allege that Plaintiff reported in this appointment that he could see light through his right eye but otherwise had no visual acuity in that eye. Hoddenbach disputes this characterization, however, and information about his alleged report does not appear in the medical records. (*Id.*) Hoddenbach asserts that he did not in fact lose all vision in his right eye until after the September 2021 appointment. (Pl. Resp. to DSOF [69] ¶ 15; Ex. A, Hoddenbach Dep. [65-1], at 24:18–22.) Dr. Popovich provided Hoddenbach with artificial tears and urged him to continue wearing safety glasses for eye protection. (Pl. Resp. to DSOF [69] ¶ 18.) He also instructed Hoddenbach to return if he noticed symptoms of retinal detachment and contends that he "did not see any evidence of a retinal detachment in Plaintiff's right eye." (*Id.*; *see also* Medical Records [65-2] at 11; Ex. B [65-2] Popovich Decl. ¶ 10.) The medical records do not discuss an offsite referral; Defendants assert that Dr. Popovich "did not see any clinical necessity to refer Plaintiff to an off-site provider at [that] time," though this observation does not appear in the medical records. (Ex. B [65-2] Popovich Decl. ¶ 11.)

Hoddenbach has a different perspective on these events: he claims that during the September 2021 appointment, he complained of "pain, throbbing, and irritation in his right eye." (PSOF [70] ¶ 3.) Hoddenbach says that he told Dr. Popovich about his two prior retinal detachment events and surgeries. (*Id.* ¶ 6.) He agrees that Dr. Popovich diagnosed him with a traumatic cataract and iris damage (*id.* ¶ 4), but contends that Popovich never informed him about symptoms of retinal detachment, and that Popovich promised to refer him to an ophthalmologist, but never did so. (Pl. Resp. to DSOF [69] ¶ 18.) Hoddenbach further contends that, contrary to what the medical records show, Popovich did not conduct a slit lamp examination. (*Id.* ¶ 22;

Medical Records [65-2] at 11.)

In the year following the September 2021 examination, Hoddenbach claims that he lost all vision in his right eye. (PSOF [70] ¶ 8.) On September 7, 2022, when he again saw Dr. Popovich, Popovich asserts that "Plaintiff did not report any pain in his eyes at that time and his condition was otherwise unchanged." (DSOF [65] ¶ 20.) The medical records also state that Hoddenbach had "no new vision complaints." (Medical Records [65-3] at 12.) In that visit, Dr. Popovich diagnosed Plaintiff as suffering from posterior vitreous detachment (PVD)[3] in his left eye and a traumatic cataract in his right eye. (DSOF [65] ¶ 20.) Plaintiff requested a referral to an ophthalmologist regarding the cataract, and Dr. Popovich wrote and submitted a referral to UIC's clinic. (*Id.*; Pl. Resp. to DSOF [69] ¶ 20.) He also reminded Plaintiff to wear safety glasses ("to protect his eyes") and directed Plaintiff to return immediately if he noticed "floaters or flashes of light in his vision." (Pl. Resp. to DSOF [69] ¶ 20.) Plaintiff claims that he did complain of pain and throbbing in his eye but otherwise agrees with Dr. Popovich's account of the September 2022 appointment. (*Id.*)

The court notes that Plaintiff's characterization of this appointment is somewhat puzzling. Recall that Plaintiff claims that he lost all vision in his right eye between the 2021 and 2022 appointments. Accordingly, one would expect Plaintiff to inform Dr. Popovich of his vision loss during his September 2022 appointment. But he does not allege that he informed Dr. Popovich of his vision loss. (*See* Compl. [1] at 11–14; Pl. Resp. to DSOF [69] at ¶ 20; PSOF [70] ¶ 9.) During his deposition, Plaintiff recalled that "somewhere between 10 and 30" of his sick call requests were related to his eye during this year-long period, but he does not discuss (nor does the record clarify) the specific subject of the sick call requests, whether they mentioned his vision loss, or whether additional action was taken in reporting or responding to Plaintiff's vision loss. (Pl. Dep. [65-1] at 26:6–10.)

[3] PVD is "a condition where the vitreous gel in the eye separates from the retina." (DSOF [65] ¶ 20.)

On February 22, 2023,[4] Plaintiff saw Dr. Michael Chen, an ophthalmologist at the UIC clinic, pursuant to Dr. Popovich's September 2022 referral. (DSOF [65] ¶¶ 21, 23; PSOF [70] ¶ 14; [65-4] Chen Dep. [65-4] at 8:13–16; Pl. Resp. to DSOF [69] ¶ 49.) Dr. Chen noted there was no cataract in Hoddenbach's right eye. (DSOF [65] ¶ 21; Medical Records [65-2] at 13.) He conducted an ultrasound, which showed (1) that a previously implanted lens in Plaintiff's right eye was completely fibrosed over,[5] and (2) that Plaintiff's right-eye retina had become completely detached, resulting in loss of vision in that eye. (DSOF [65] ¶ 21.) Again, the chronology as to when Plaintiff completely lost vision in his right eye is somewhat confusing: In Plaintiff's deposition, he contends that he lost all vision in his right eye between September 2021 and September 2022. (PSOF [70] ¶ 8; Ex. A [65-1], Hoddenbach Dep. at 24:18–25:1). There is otherwise no record that Plaintiff explained to Dr. Popovich in September 2022, or to any other provider, of the loss of vision in his right eye. When Dr. Chen saw Plaintiff in February 2023, Dr. Chen diagnosed Plaintiff as suffering from "phthisis bulbi of his right eye," that is, "an end stage eye disease where the eye shrinks and disorganizes due to severe damage or long-standing inflammation." (DSOF [65] ¶ 21.) Defendant attributes this condition to "traumatic retinal detachment from [Hoddenbach's] childhood and in 2010" (*id.*), but, as Plaintiff notes, no such specific attribution appears in the medical records (Pl. Resp. DSOF [69] ¶ 21). Dr. Chen determined that Plaintiff would not recover vision in his right eye (DSOF [65] ¶ 21), prescribed Hoddenbach prednisolone (steroidal eye drops) to treat pain from the phthisis bulbi (Medical Records [65-2] at 13), and recommended Plaintiff follow-up with providers in three months (DSOF

---

[4] Based on the parties' statements of fact and the record, it is unclear why Dr. Popovich's September 2022 referral did not result in an appointment with UIC until roughly five months later.

[5] Dr. Ann-Marie Lobo-Chan, an ophthalmologist and witness for Defendants, said this means that a "fibrotic membrane encapsulat[ed]" his implant. (Ex. E [65-5] at 26:2–7.) The court notes that fibrotic tissue is more commonly known as "scar tissue." *What is Fibrotic Tissue?*, Biology Insights (July 24, 2025), https://biologyinsights.com/what-is-fibrotic-tissue-the-science-of-fibrosis (last visited Sept. 23, 2026).

[65] ¶ 22).

The next day, February 23, 2023, Plaintiff met with Defendant Dr. Sy, Dixon's medical director, to "review the findings and recommendations" from Plaintiff's appointment with Dr. Chhen. (*Id.* ¶ 24.) Sy approved each of Dr. Chen's recommendations, "noted that the prison pharmacy had dispensed" Plaintiff's eye drops, and referred Plaintiff to prison optometry so that he could receive protective eye wear that would fit him properly. (*Id.*) Plaintiff does not dispute that Dr. Sy approved the eye drop prescription, but claims that over the next few years, he routinely had problems receiving the drops and was unable to get them at all approximately 25% of the time because the pharmacy was often out of stock. (PSOF [70] ¶¶ 10, 13.)

On March 25, 2023, Plaintiff wrote a letter to Dr. Popovich. Plaintiff wrote that he had seen Dr. Chen, asserted that Dr. Popovich did not properly log his reported pain on September 22, 2021 or on September 7, 2022, complained of continued eye pain, asked for safety goggles, and wrote, "[d]on't you think you should talk to me about my eye?" (Ex. A [65-1], Hoddenbach Dep. at 30:19–31:7, 148–49 (letter attached).) Plaintiff wrote a letter to Dr. Sy on the same day, stating that it had been a month since Dr. Sy had said he did "[not] know about the goggles," and Plaintiff asked for an update on the situation.[6] (*Id.* at 150 (letter attached).) Plaintiff testified that neither doctor responded to the letters, and that while he is not sure whether Drs. Sy and Popovich received them prior to the litigation, he "ha[d] to assume that [their] medical staff" gave the letters to them. (*Id.* at 30:19–31:12, 38:16–39:8.) Nearly three months after Plaintiff's meeting with Dr. Sy, in which he referred Plaintiff to optometry so someone could fit him for safety glasses, on May 21, 2023, Plaintiff had another appointment with Dr. Popovich to fit him for the safety glasses.[7]

[6] It is unclear what the Plaintiff meant here, as Dr. Sy had approved all of Dr. Chen's recommendations and referred Plaintiff to prison optometry to be fitted for protective goggles on February 23. (DSOF [65] ¶ 24.) Plaintiff admitted this fact. (Pl. Resp. to DSOF [69] ¶ 24.)

[7] While the medical records suggest this appointment took place on May 31, 2023, (Medical Records [65-2] at 33), both parties agree it took place on May 21, 2023. (DSOF [65] ¶ 26 (undisputed in relevant part).)

(DSOF [65] ¶ 26.) Popovich fitted Plaintiff for the protective eyewear, which was delivered to the prison and given to Plaintiff on June 15, 2023. (*Id.*) Plaintiff is not pursuing any claim based on the safety glasses. (Pl. Resp. to DSOF [69] ¶ 26 ("Mr. Hoddenbach is not pursuing a claim based on safety glasses.").)

On August 30, 2023, Plaintiff had another appointment at the UIC eye clinic—again, the parties do not explain what prompted this appointment. (*Id.* ¶ 28.) He complained of continued pain but noted that it had improved with the use of the eyedrops. The provider recommended Plaintiff's prescription be refilled and "noted that Plaintiff's visual condition had remained unchanged from his last appointment." (*Id.*) On September 6, 2023, Plaintiff met with Dr. Sy to discuss the appointment. (*Id.* ¶ 29.) Sy approved the UIC's recommendations, ordered a refill of the eye drops, and referred Plaintiff to on-site optometry for larger-sized protective eyewear. (*Id.*)

Following this appointment, Plaintiff continued to experience eye pain. On October 20, 2023, he saw a nurse referred to as "RN Butler" at Dixon and complained about right-eye pain that was not responding to his eye drops. (*Id.* ¶ 31.) Butler referred Plaintiff to the on-site prison optometry department. (*Id.*) When Dr. Popovich saw Plaintiff on October 25, 2023, Popovich observed a stye on Plaintiff's right eye lid, causing the eye to become inflamed and red. (*Id.* ¶ 32.) Popovich prescribed an antibiotic, recommended warm compresses, and continued the prescription eye drops. (*Id.* ¶ 33 (undisputed).)

Several months passed, and Plaintiff continued experiencing pain and having trouble getting his eye drops. On March 8, 2024, Plaintiff returned to the UIC eye clinic and saw Dr. Pooja Bhat, an ophthalmologist.[8] (*Id.* ¶ 35.) Plaintiff complained that his right eye pain persisted despite the use of the eyedrops. (*Id.*) Dr. Bhat referred Plaintiff to the oculoplastics[9] clinic at UIC for

[8] *Find a Provider: Pooja Bhat, MD*, UI Health, https://hospital.uillinois.edu/find-a-doctor/pooja-bhat (last visited Sept. 23, 2026).

[9] Oculoplastics surgeries are procedures that repair or change the appearance of parts of your face connected to and around your eyes; they can be both cosmetic and medical.

further evaluation. (*Id.*) On March 18, 2024, Wexford Health Sources—the IDOC contractor that handles medical care for inmates—approved the oculoplastics referral, but, as Plaintiff admits, he "th[e] appointment." (*Id.* ¶ 36; Pl. Resp. to DSOF [69] ¶ 36.) He does not explain why.

On July 1, 2024, Plaintiff saw Nurse Practitioner ("NP") Tuell at Dixon and complained of increased pain. (*Id.* ¶ 38.) NP Tuell referred Plaintiff to Dr. Popovich, who saw him two days later. (*Id.* ¶ 39.) Plaintiff told Popovich that he had changed his mind and wanted to go to the UIC oculoplastic clinic; Popovich entered the referral and Plaintiff had an oculoplastic appointment on September 5, 2024. (*Id.* ¶¶ 39–40.) Dr. Sasha Hubschman, an ophthalmologist who specializes in oculoplastic surgery,[10] noted that the use of "proparacaine eye drops," a numbing agent, relieved Plaintiff's pain. (*Id.* ¶ 40.) She also prescribed "atropine eye drops," which are used to relax the eye's muscles, and recommended an increased dosage of the prednisolone drops. (DSOF [65] ¶ 40.) She "noted that Plaintiff's treatment regimen focus was on 'aggressive lubrication' of the eye," and recommended that Plaintiff return in three to four weeks. (*Id.*) That same day, Wexford nurse practitioner Kristina Mershon noted both that Plaintiff's medications were ordered and that the follow-up appointment with the UIC was approved. (*Id.*) Wexford Health Sources approved Plaintiff for further care in the oculoplastics clinic on September 25, 2024. (Notice of Authorization [65-2] at 73.)

Roughly six months later, on March 4, 2025, Plaintiff returned to the UIC oculoplastics clinic and again saw Dr. Hubschmann.[11] (DSOF [65] ¶ 42.) The six-month delay in care again remains unexplained. Plaintiff told Dr. Hubschmann that "his pain was relieved by lubrication with

---

*Oculoplastics (Oculoplastic Surgery)*, Cleveland Clinic (Oct. 4, 2024), https://my.clevelandclinic.org/health/articles/oculoplastics-oculoplastic-surgery (last visited Sept. 23, 2026).

[10] *Dr. Sasha Hubschman M.D.*, U.S. News & World Rep., https://health.usnews.com/doctors/sasha-hubschman-3046280 (last visited Sep. 23, 2026).

[11] The court notes that the parties identify no evidence of any follow-up appointment at UIC between July 2024 and March 2025, despite the oculoplastics provider requesting that Plaintiff follow up in 3–4 weeks. It is not clear whether the follow-up appointment took place as scheduled, and if so, what occurred at that appointment. (DSOF [65] ¶ 40.)

artificial tears." (*Id.*) When Plaintiff returned to Dixon, staff gave him the artificial tears recommended by Dr. Hubschmann, and Plaintiff noted that he had "additional eye drops and ointments in his cell," though the record does not reflect any further specifications regarding these additional medications. (*Id.*)

This lawsuit resulted. Plaintiff filed a *pro se* complaint [1] on May 12, 2023, alleging that Dr. Sy and Dr. Popovich's treatment of his eye condition constituted cruel and unusual punishment in violation of the Eighth Amendment of the Constitution. The court recruited pro bono counsel to represent him; Defendants subsequently moved for summary judgment [63]. That motion is now fully briefed.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 661 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). Parties genuinely dispute a material fact where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stockton v. Milwaukee County*., 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)). "A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge." *Id*. (citing *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018)).

### II. Analysis

Plaintiff brought his federal civil rights claim under 42 U.S.C. § 1983, alleging that prison officials were deliberately indifferent to his medical conditions. The Eighth Amendment of the Constitution protects prisoners from "cruel and unusual punishments." U.S. Const. amend. VIII. Because the "unnecessary and wanton infliction of pain" is a cruel and unusual punishment, state governments are required to provide medical care to prisoners in their custody. *Estelle v. Gamble*,

429 U.S. 97, 104–05 (1976). The Constitution does not require perfect care, however; the failure to treat a condition runs afoul of the Constitution only when it amounts to "deliberate indifference to serious medical needs of prisoners." *Brown v. LaVoie*, 90 F.4th 1206, 1211–12 (7th Cir. 2024) (quoting *Estelle*, 429 U.S. at 104).

Courts evaluating deliberate indifference claims apply a two-step test: (1) the prisoner must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective element of this test requires a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "The subjective element 'mirrors the recklessness standard of the criminal law' in that the defendant must have actually known of and ignored a substantial risk to the plaintiff's health; mere negligence or even malpractice is not sufficient." *Wilson v. Wexford Health Sources, Inc.*, 726 F.Supp.3d 881, 893 (N.D. Ill. 2024) (quoting *Brown*, 90 F.4th at 1212). The plaintiff must prove "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the[ir] decision on such judgment." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023) (citation omitted). This can take the form of either inappropriate care or an "unjustifiable delay" in providing care that "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Id.* (citation omitted).

Plaintiff first argues that Defendant Dr. Popovich was deliberately indifferent to Plaintiff's complaints during the September 22, 2021 eye exam. (Pl. Opp'n [68] at 5–6.) He claims that he told Dr. Popovich of "pain, irritation, and throbbing" in his right eye, but Dr. Popovich misdiagnosed him with a cataract as opposed to examining him for retinal detachment. (*Id.* at 6–7.) Plaintiff contends that due to several risk factors, including his age, pain, and previous retinal

detachments, Dr. Popovich should have evaluated him for a detached retina. (*Id.* at 7–8.) Plaintiff appears to rely on the testimony of Defendant's experts to establish these risk factors. (*Id.*) Plaintiff contends, further, that Dr. Popovich promised to refer him to a specialist but never did. (*Id.* at 5–6.) Finally, although the medical records include results from a slip lamp exam in September 2021, Plaintiff insists that Dr. Popovich did not perform a slit lamp exam at that time, resulting in his purported misdiagnosis. (*Compare id.* at 8 *with* Medical Records [65-2] at 11.)

These circumstances, troubling as they are, do not rise to the level of a constitutional violation. As previously mentioned, Dr. Popovich stated that he did not note evidence of retinal detachment during the September 2021 appointment, and encouraged the Plaintiff to return if he noticed new symptoms during both the 2021 and 2022 appointments. (Ex. B, Popovich Decl. [65-2] ¶¶ 10, 12.) In both appointments, the medical records indicate that Hoddenbach had no new vision complaints since the prior exams. (Medical Records [65-2] at 11, 12.) Plaintiff claims that Dr. Popovich should have inferred possible retinal detachment because of Plaintiff's risk factors, but he offers no expert testimony to that effect. Instead, he relies on Defendant's experts, who do discuss risk factors for retinal detachment but do not render any opinions about the standard of care provided by Drs. Sy or Popovich. (Chen. Dep. [65-4] at 10:19–22, 30:2–17; Lobo-Chan Dep. [65-5] at 15:4–7, 37:18–24.) Plaintiff offers no evidence that Dr. Popovich's misdiagnosis and conduct were so beyond the pale that "no minimally competent medical professional" would have responded to the circumstances as Dr. Popovich did. *Arce*, 75 F.4th at 681 (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). As the Seventh Circuit has recognized on many occasions, negligence, even gross negligence, is not deliberate indifference. *See Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) ("[M]edical malpractice 'does not become a constitutional violation merely because the victim is a prisoner.'" (quoting *Estelle*, 429 U.S. at 106)). Rather, the evidence must show "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012)). Plaintiff has offered no

evidence—nor any expert testimony—from which a reasonable jury could draw such an inference.

Plaintiff next attacks Defendants' "failure to ensure a reliable supply of steroid eye drops to treat Mr. Hoddenbach's pain." (Opp'n [68] at 8–9 (cleaned up).) Gaps in the supply of eye drops in the prison pharmacy are also troubling, but there is no evidence that Dr. Popovich or Dr. Sy is responsible for this. In cases brought under 42 U.S.C. § 1983, there is no vicarious liability—defendants are liable only if they know about and are personally involved in a constitutional deprivation. *See Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 479 (7th Cir. 2024). The court will assume, for purposes of this ruling, that the prison's failure to stock eye drops was an Eighth Amendment violation, but there is no evidence that either Defendant was personally involved, given that neither worked in the prison pharmacy nor was personally responsible for ensuring a continuous supply of medications. Indeed, there is no evidence that Dr. Sy was ever aware that the prison was out of stock of Plaintiff's eyedrops. *Ollison v. Gossett*, 136 F.4th 729, 741 (7th Cir. 2025) (affirming district court's grant of summary judgment for prison warden because there was little evidence that the warden "knew of the health care unit's defects and consciously disregarded them"). This theory of deliberate indifference cannot proceed to trial.

Plaintiff's responds to these arguments by asserting that Dr. Sy, the medical director of Dixon, could be held liable "where [he] knows about the allegedly wrongful conduct of others and facilitates, approves, condones, or turns a blind eye toward it." (Opp'n [68] at 9.) This is a correct statement of the law, but there is no evidence that Dr. Sy turned a blind eye to the pharmacy's failure to stock eye drops. In fact, Plaintiff acknowledges that he has no evidence of Sy's involvement but nonetheless argues that the prison's lack of eye drops constitutes "circumstantial evidence" from which a jury could "infer" that Dr. Sy was complicit in the prison's shortages. (*Id.*) Not so—the jury cannot take Plaintiff's recollection that the pharmacy routinely ran out of his eye drops and then simply guess that Dr. Sy must have been personally involved in the shortage. That is speculation, and speculation is not sufficient to survive summary judgment. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 831 (7th Cir. 2026).

* * * * *

What appears clear on this record is that the treatment Plaintiff received in custody was unsatisfying to him. Plaintiff had a serious eye condition that dated from childhood. While at Dixon, there were unexplained delays in his medical care. Moreover, the prison's repeated failure to ensure that Plaintiff's eye drops were in stock was understandably frustrating for him. But on this record, there is no evidence that Dr. Sy or Dr. Popovich were deliberately indifferent to Plaintiff's condition, and he has offered no expert testimony to this effect.

**CONCLUSION**

Defendants' motion for summary judgment [63] is granted. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff.

ENTER:

Dated: September 25, 2026

REBECCA R. PALLMEYER
United States District Judge